UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWIN ORTIZ, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 3:15-cv-30215-KAR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION OR REMAND AND DEFENDANT'S
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 15 & 20)

ROBERTSON, U.S.M.J.

I.      INTRODUCTION

Before the court is an action for judicial review of a final decision by the Acting

Commissioner of the Social Security Administration ("Commissioner") regarding an individual's

entitlement to Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1381(c)(3).

Plaintiff Edwin Ortiz ("Plaintiff") asserts that the Commissioner's decision denying him such

benefits -- memorialized in a July 28, 2014 decision of an administrative law judge ("ALJ") -- is

not supported by substantial evidence.  Plaintiff has filed a motion to reverse or remand (Dkt.

No. 15) and the Commissioner, in turn, has moved to affirm (Dkt. No. 20).

The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R.

Civ. P. 73.  For the following reasons, the court will ALLOW the Commissioner's motion to

affirm and DENY Plaintiff's motion to reverse or remand.

II.     FACTUAL BACKGROUND

1

Plaintiff was born in Puerto Rico and, at the time of the ALJ hearing, was 49 years old and had lived in the United States for approximately thirty years (Administrative Record ("A.R.") at 42, 62).  Although he is unable to read or write in either English or Spanish, he speaks and understands both languages (*id.* at 44-46, 73).  He worked as a welder for about five years (*id.* at 43-44).  Because asthma and wrist surgery prevented him from performing his job, he stopped working as a welder in January 2008 when he was 43 years old (*id.* at 19, 46-48).  In his application for SSI, Plaintiff alleged that he was disabled due to liver disease, specifically hepatitis C, pain in his back and right hand, asthma, and depression (*id.* at 90, 112, 860).

III.     PROCEDURAL BACKGROUND

Plaintiff applied for SSI on May 7, 2012 alleging an onset of disability on January 25, 2008 (*id.* at 90, 291).  The application was denied initially and upon reconsideration (*id.* at 105-12, 116-18).  Following a hearing on May 21, 2014, the ALJ issued his decision on July 28, 2014 finding Plaintiff was not disabled (*id.* at 12, 19, 29).  The Appeals Council denied review (*id.* at 1-5).  This appeal followed.

IV.     DISCUSSION

A.     Legal Standards

1.     Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for a rehearing.  *See* 42 U.S.C. § 1383(c)(3).  Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law de novo, but must defer to the ALJ's findings of fact if they are supported by substantial evidence.  *See id.* (citing *Nguyen v.*

2

*Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).  Substantial evidence exists "'if a reasonable mind,

reviewing the evidence in the record as a whole, could accept it as adequate to support [the]

conclusion.'"  *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir.

1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)).

"Complainants face a difficult battle in challenging the Commissioner's determination because,

under the substantial evidence standard, the [c]ourt must uphold the Commissioner's

determination, 'even if the record arguably could justify a different conclusion, so long as it is

supported by substantial evidence.'"  *Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 159

(D. Mass. 2010) (quoting *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3

(1st Cir. 1987)).  In applying the substantial evidence standard, the court must be mindful that it

is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts

in the evidence, and draw conclusions from such evidence.  *See Irlanda Ortiz,* 955 F.2d at 769.

That said, the Commissioner may not ignore evidence, misapply the law, or judge matters

entrusted to experts.  *See Nguyen*, 172 F.3d at 35.

2. Standard for Entitlement to Social Security Disability Insurance Benefits and Supplemental Security Income.

In order to qualify for SSI, a claimant must demonstrate that he was disabled within the

meaning of the Social Security Act (the "Act") and that he had financial need.  *See* 42 U.S.C. §

1381a.  "Plaintiff's need, for purposes of SSI, . . . [is] not challenged.  The only question is

whether the ALJ had substantial evidence with which to conclude that Plaintiff did not suffer

from a disability."  *Bitsacos v. Barnhart*, 353 F. Supp. 2d 161, 165-66 (D. Mass. 2005).

The Act defines disability, in part, as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

3

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  An individual is considered disabled

under the Act

> only if his physical or mental impairment or impairments are of such severity that he is
> not only unable to do his previous work but cannot, considering his age, education, and
> work experience, engage in any other kind of substantial gainful work which exists in the
> national economy, regardless of whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for him, or whether he would be hired if
> he applied for work.

42 U.S.C. §1382c(a)(3)(B).  *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49 (1987).

The Commissioner evaluates a claimant's impairment under a five-step sequential

evaluation process set forth in regulations promulgated under the Act.  *See* 20 C.F.R. §

416.920(a).  The hearing officer must determine:  (1) whether the claimant is engaged in

substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3)

whether the impairment meets or equals a listed impairment contained in Appendix 1 to the

regulations; (4) whether the impairment prevents the claimant from performing previous relevant

work; and (5) whether the impairment prevents the claimant from doing any work considering

the claimant's age, education, and work experience.  *See id*; *see also Goodermote v. Sec'y of

Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the

hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the

analysis does not continue to the next step.  *See* 20 C.F.R. § 416.920.

Before proceeding to steps four and five, the Commissioner must make an assessment of

the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant

can do past relevant work and at step five to determine if the claimant can do other work.  *See id*.

"The RFC is an administrative assessment of the extent to which an individual's medically

determinable impairment(s), including any related symptoms, such as pain, may cause physical

or mental limitations or restrictions that may affect his or her capacity to do work-related

physical and mental activities."  Social Security Regulation ("SSR") 96-8p, 1996 WL 374187, at

*2 (July 2, 1996).  Put another way, "[a]n individual's RFC is defined as 'the most you can still

do despite your limitations.'"  *Dias v. Colvin*, 52 F. Supp. 3d 270, 278 (D. Mass. 2014) (quoting

20 C.F.R. § 416.945(a)(1)).

The claimant has the burden of proof through step four of the analysis.  At step five, the

Commissioner has the burden of showing the existence of jobs in the national economy that the

claimant can perform notwithstanding impairment(s).  *See Goodermote*, 690 F.2d at 7.

      B.     <u>Medical Records</u>

          1.     Physical condition.

Plaintiff presented the ALJ and the court with medical records that spanned the period

from January 2007 through July 2014.  Northgate Medical P.C. ("Northgate") provided Plaintiff's

primary care.  New England Orthopedic Surgeons ("NEOS"), Pioneer Spine and Sports

Physicians, P.C. ("Pioneer"), and the Arthritis Treatment Center treated Plaintiff's right wrist.

An infectious disease physician at Baystate Medical Center ("BMC") treated Plaintiff's liver

condition.  Plaintiff also received treatment at the Mercy Medical Center ("Mercy").

          2.     Mental condition.

Plaintiff received mental health treatment from the Center for Psychological and Family

Services ("CPFS") and Behavioral Health Network Crisis Services ("BHN").  Margarita

Hernandez, Ph.D. examined Plaintiff on January 26, 2013 at the request of the Massachusetts

Rehabilitation Commission's Disability Determination Services (A.R. at 644).  Dr. Hernandez

diagnosed Plaintiff with depressive disorder not otherwise specified ("NOS") and learning

disorder NOS and assigned a Global Assessment of Functioning ("GAF") score of 70 (*id.* at

648).[1]  Testing of reading and mathematics revealed that Plaintiff's "level of intellectual functioning [was] in the low average range," although Dr. Hernandez indicated that Plaintiff "was exaggerating his limitations" (*id.*).

Details of these and other records pertinent to Plaintiff's physical and mental conditions, including those of state agency consultants, will be discussed in the context of Plaintiff's objections to the ALJ's decision.

C.      The ALJ Hearing.

Plaintiff and independent vocational expert ("VE") Courtney Olls testified before the ALJ (*id.* at 36).  Plaintiff testified about his asthma, his right hand and wrist, and his mental impairments (*id.* at 48, 60-61).  Doctors told him that smoking was forbidden due to his asthma (*id.* at 48).  Plaintiff first testified that he stopped smoking two years ago, then indicated that he stopped one year ago, and finally told the ALJ that he still smoked, but not like he "used to before" (*id.* at 47-48).

Plaintiff indicated that he is right-handed and has "hardware" in his right wrist that his NEOS physician did not want to remove (*id.* at 48-49, 72).  According to Plaintiff, he was unable to use his hand too much and opening and closing it was painful (*id.* at 79).  His ability to

---

[1] "A GAF score represents 'the clinician's judgment of the individual's overall level of functioning.'"  *Plourde v. Colvin*, No. 1:12-cv-194-JAW, 2013 WL 1345519, at *3 n.4 (D. Me. Mar. 14, 2013), *aff'd*, No. 1:12-CV-00194-JAW, 2013 WL 1344721 (D. Me. Apr. 2, 2013) (quoting American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)) ("*DSM–IV–TR*").  "The GAF score is taken from the GAF scale, which 'is to be rated with respect only to psychological, social, and occupational functioning.'"  *Id.* (quoting *DSM-IV-TR* at 32).  "The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)."  *Id.*  (citing *DSM-IV-TR* at 34).

perform household chores was limited to washing dishes, which he accomplished with one hand (*id.* at 72).

Plaintiff told the ALJ that the effects of his hepatitis C medication prevented him from working every day because the treatment made him tired and weak (*id.* at 50, 71).  He voluntarily committed himself to a mental health facility because the medication "got him thinking too wild," and he went to a crisis center three or four times because of depression, which interfered with his ability to concentrate (*id.* at 59-61).

The ALJ asked him about cocaine abuse (*id.* at 52).  Plaintiff first testified that he had last used cocaine about one year earlier (*id*. at 52).  When questioned about testing positive for cocaine on April 11, 2014, about one month before the hearing, Plaintiff denied using drugs (*id.* at 53, 54, 56, 57).  Initially, he indicated the test was wrong, then told the ALJ the positive result was due to the opiate medication that he took for the pain in his wrist (*id.* at 53-58).

The VE testified about jobs that were consistent with job descriptions in the DOT (*id*. at 74).  The ALJ posed the following hypothetical:

> Let's assume we are dealing with a person . . . who can only do light work . . . . And let us assume further that the individual that we're talking about here is capable of . . . a job that would . . . allow him to sit and stand whenever and for as long as he wished; and would require him to remember and carry out no more than simple instruction.

(*id.* at 75).  The VE indicated that there were light, unskilled jobs in the national and regional economy for a person with this background and RFC, specifically assembling small parts, packing by hand, and soldering (*id*. at 76).  No jobs, however, were available if the person described in the hypothetical would not be able to use both hands or had only gross motor function in one hand (*id*. at 79-80).

       D.      The ALJ's Decision

Following the hearing on May 21, 2014, the ALJ denied Plaintiff's claim on July 28, 2014 (*id*. at 19, 29).  In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of March 28, 2012 (*id.* at 21).  20 C.F.R. § 416.971 *et seq*.  At step two, the ALJ found that Plaintiff was severely impaired due to impingement of his right shoulder, hepatitis C, and "status post arthrodesis of right wrist and associated chronic pain syndrome" (A.R. at 21).  20 C.F.R. § 416.920(c).  The ALJ found that Plaintiff's diabetes, asthma, depression, and learning disorder were not severe (A.R. at 21).  Plaintiff's impairments, either alone or in combination, however, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id*. at 26).

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform light work,[2] with the following limitations:

> he would require a sit/stand option at his discretion, and could remember and carry out only simple instructions.

(*id.* at 27).

---

[2] The Social Security Administration ("SSA") defines light work as that which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing light work, [a claimant] must have the ability to do substantially all of these activities.  If someone can do light work, [the SSA] determine[s] that he or she can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567.  Plaintiff's inability to sit for long periods of time eliminated sedentary work (A.R. at 61, 75, 77).

At step four, the ALJ found that Plaintiff was not able to perform any past relevant work (*id.* at 28).  *See* 20 C.F.R. § 416.965.  Finally, at step five, the ALJ determined, based on the VE's testimony, that Plaintiff can perform jobs that exist in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (A.R. at 28-29).  *See* 20 C.F.R. § 416.969.

     E.     <u>Plaintiff's Objections</u>

Plaintiff raises three objections to the ALJ's decision.  First, he criticizes the ALJ for determining that he was able to use his right hand (Dkt. No. 16 at 7).  Next, he argues that the ALJ erred by finding that his mental impairments were not severe (*id.* at 6).  Finally, Plaintiff complains about the ALJ's failure to give the opinion of his treating mental health sources controlling weight (*id.* at 8-9).  Each of Plaintiff's complaints about the ALJ's decision will be discussed in turn.

     1.     The ALJ correctly determined that Plaintiff could use his right hand.

The medical evidence does not support Plaintiff's allegation that he "indisputably has loss of right hand function as the result of an injury sustained in 2006" (*id.* at 7).  Instead, the ALJ's determination -- that Plaintiff's right hand was functional notwithstanding the arthrodesis of his right wrist -- is supported by substantial record evidence (A.R. at 27, 28).  The arthrodesis deprived the wrist joint of flexion and extension (*id.* at 401).

The Commissioner persuasively contends that Plaintiff erroneously conflates his inability to flex and extend his right wrist due to the surgery with his ability to move his hand (Dkt. No. 21 at 12-13).  Joseph Wenner, M.D. of NEOS performed the arthrodesis on Plaintiff's right wrist on August 10, 2010 (A.R. at 385-87).  NEOS's records that spanned the period from after Plaintiff's surgery in 2010 through December 2012 show that Plaintiff had full range of motion in

his fingers (*id.* at 376, 378, 379, 383, 390, 392, 393, 656, 658, 661, 662).  In September 2013 at

Northgate, Plaintiff had normal movement in all his extremities (*id.* at 23, 675).  In the same

month, Douglas Molin, M.D. of Pioneer observed "[g]ood isolated movements in all muscle

groups, upper extremities, except right wrist flexion/extension – no flexion/extension [of] right

wrist" (*id.* at 665).  Plaintiff visited the Mercy emergency room on February 9, 2014 complaining

of pain in his right wrist (*id.* at 760).  On that date, Plaintiff could move all four extremities (*id.*

at 760).  His hand grasp was equal in strength bilaterally and he was able to "oppose each digit to

his thumb on his right hand" (*id.*).  He was "able to flex and extend [his] right wrist without

limitation (*id.* at 761).  This record evidence supports the ALJ's determination that Plaintiff's

right hand was functional.  *See Rodriguez*, 647 F.2d at 222 ("[Courts] must uphold the

Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole,

could accept it to support his conclusion.").

        The ALJ afforded "substantial weight" to the non-examining state agency consultant's

RFC assessment that was in accord "with the greater weight of the evidence" showing Plaintiff's

right hand was functional (A.R. at 25).  "[B]ecause State agency medical consultants are

considered experts in the evaluation of disability claims, the Social Security regulations *'require*

administrative law judges . . . to consider their findings of fact about the nature and severity of an

individual's impairment(s) as opinions of nonexamining physicians[.]'" *Peltonovich v. Colvin*,

Civil Action No. 13-11246-JGD, 2014 WL 4716190, at *11 (D. Mass. Sept. 19, 2014), *aff'd,* No.

14-2212 (1st Cir. Aug. 24, 2015) (quoting SSR 96–6p, 1996 WL 374180, at *2 (July 2, 1996)).

*See also* 20 C.F.R. § 404.1527(e)(2)(i).  "This includes State agency physicians' assessments

regarding a claimant's RFC." *Peltonovich*, 2014 WL 4716190, at *11 (citing SSR 96-6p, 1996

WL 374180, at *4).

After review of Plaintiff's records, the consultant, Elaine Hom, M.D., determined that Plaintiff was limited to frequently lifting ten pounds and occasionally lifting twenty pounds and had a limited range of motion of his right wrist (A.R. at 99, 100).[3]   Dr. Hom did not mention restrictions on Plaintiff's ability to use his right hand, which is consistent with the treatment providers' medical reports.   The ALJ's reliance on her opinion was warranted.   *See Monroe v. Barnhart,* 471 F. Supp. 2d 203, 212–13 (D. Mass. 2007) ("The hearing officer's choice to accept a non-treating, non-examining physician's assessment is completely permissible within the regulations 'provided there is support for the result in the record.'") (quoting *Shaw v. Sec'y of Health & Human Servs.,* No. 93-2173, 1994 WL 251000, at * 4 (1st Cir. June 9, 1994)).

Although the ALJ credited Plaintiff's assertion that he suffered from pain in his right hand, the ALJ's rejection of Plaintiff's description of the pain's severity and debilitating impact was supported by clear and convincing evidence (A.R. at 28, 72).   *See, e.g., Pires v. Astrue*, 553 F. Supp. 2d 15, 22 (D. Mass. 2008) (if an ALJ finds the claimant's impairments, as demonstrated by objective medical evidence, reasonably can be expected to cause pain, an ALJ must evaluate whether the functionally limiting effect of the pain is disabling).   "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987).

The medical evidence, including the records discussed above, and the evidence of Plaintiff's ability to carry out daily living activities contradicted Plaintiff's assertion that his hand

---

[3] The ALJ's RFC for light work included restrictions on lifting no more than twenty pounds and frequently lifting and carrying no more than ten pounds (A.R. at 27).   *See* 20 C.F.R. § 404.1567.

pain was disabling (A.R. at 79).  In December 2012, Dr. Wenner "pressed pretty firmly on the area [Plaintiff] point[ed] to as the site of pain [in his right hand] and it didn't seem to hurt him very much if at all" (*id.* at 662).  There was no swelling in the area and Plaintiff had "full movement of his fingers" (*id.*).  *Compare Cordero v. Colvin*, Civil Action No. 10-12104-DJC, 2013 WL 5436970, at *16 (D. Mass. Sept. 25, 2013) ("The ALJ may rely on objective medical evidence that demonstrates improvement in physical impairments to support his conclusion that complaints are not credible.") (citing SSR 96–7p, 1996 WL 374186, at *6 (July 2, 1996); 20 C.F.R. § 404.1529(c) (2)).  Amitriptyline, which Dr. Molin prescribed, alleviated the pain without side effects (A.R. at 692).  *See Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986) (holding that ALJ must consider effectiveness of pain medication as a factor in assessing claimant's credibility regarding severity of pain that is not supported by medical evidence); *Hewes v. Astrue*, No. 1:10-cv-513-JAW, 2011 WL 4501050, at *7 (D. Me. Sept. 27, 2011), *aff'd*, No. 1:10-CV-00513-JAW, 2011 WL 4916460 (D. Me. Oct. 17, 2011) (ALJ considered effectiveness of pain medication as a factor in determining claimant's credibility); 20 C.F.R. § 404.1529(c)(3)(iv).  Plaintiff's ability to "maintain personal hygiene, shop, drive" and clean also supports the ALJ's negative credibility finding (A.R. at 645).  *See id.*  In addition, Plaintiff told Dr. Hernandez that he was attempting to find a job and had attended "job ready programs" in pursuit of employment (A.R. at 645).  He testified before the ALJ that he was looking for work and had worked as a landscaper about a year before the hearing (*id.* at 25, 49). *Compare Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (a claimant's employment and seeking of work while allegedly disabled are proper grounds for discounting his testimony).

The inconsistencies in Plaintiff's testimony about his smoking and cocaine use are another factor that weighs in favor of the ALJ's credibility determination (A.R. at 25). Plaintiff initially told the ALJ that he last smoked two years before the hearing (*id.* at 24, 47). However, his testimony then evolved to having quit one year before the hearing and, finally, still smoking, but less (*id.* at 24, 47-48). When confronted with the inconsistency between his testimony that he had not used cocaine for about a year before the hearing and a positive cocaine screening in April 2014, about a month before he appeared before the ALJ, Plaintiff denied cocaine use and first said there was an error in the screening test, and, then, attributed the positive result to his prescribed medications (*id.* at 24, 53-58, 830). *See Tetreault v. Astrue*, 865 F. Supp. 2d 116, 126-27 (D. Mass. 2012) (plaintiff's lies and drug use supported ALJ's finding that claimant's assessment of pain was not credible).

The absence of record evidence to support Plaintiff's claim that he could not use his right hand dooms his argument. Consequently, the ALJ's determination that Plaintiff was not disabled based on loss of function in his right hand is supported by substantial evidence.

       2.      The ALJ correctly found that Plaintiff's mental impairment was not severe.

Plaintiff next criticizes the ALJ's step two determination that Plaintiff's depression was non-severe (Dkt. No. 16 at 6; A.R. at 21). Specifically, Plaintiff contends that his hepatitis C treatment, which was reinstituted in February 2014, causes "psychiatric . . . debility" in the form of depression and criticizes the ALJ for according "substantial weight" to the opinions of Dr. Hernandez and the state consultant, Joseph A. Whitehorn, Ph.D. and "moderate weight" to Plaintiff's treating therapists at CPFS and for ignoring his GAF scores (Dkt. No. 16 at 6, 7; A.R. 25, 102). The Commissioner counters that the ALJ's determination is supported by substantial evidence. The court agrees with the Commissioner.

Substantial record evidence, particularly Dr. Hernandez's report of her examination of Plaintiff, supports the ALJ's conclusion that Plaintiff's depression was a non-severe mental impairment (A.R. at 21). "Psychological disorders are not always disabling per se . . . ; in particular, severe anxiety or depression is not in itself sufficient to establish eligibility for benefits absent a proper showing of related functional loss." *Sitar v. Schweiker*, 671 F.2d 19, 20–21 (1st Cir. 1982) (citations omitted) (citing *Gonzalez Perez v. HEW*, 572 F.2d 886, 887-88 (1st Cir. 1978); *Reyes v. Harris*, 486 F. Supp. 1063, 1068-69 (S.D.N.Y.1980)). Focusing on functional ability, "[a] mental impairment generally is considered non-severe for purposes of Step 2 if the degree of limitation in three functional areas -- activities of daily living, social functioning, and concentration, persistence or pace -- is rated as 'none' or 'mild' and there have been no episodes of decompensation." *Munson v. Barnhart*, 217 F. Supp. 2d 162, 165 n.4 (D. Me. 2002) (quoting 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)).[4] *See also* SSR 96-8p, 1996 WL 374187, at *6 ("Work-related mental activities generally . . . include the abilities to: understand, carry out and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision and co-workers and work situations; and deal with changes in a routine work setting.").

Dr. Hernandez's report contains pertinent information about Plaintiff's functional ability (A.R. at 644-48). She indicated that Plaintiff was "independent and self-motivated" and did "his own grooming, cleaning and shopping" (*id.* at 645, 648). As for social functioning, Plaintiff reported that he was "sociable and able to communicate well with others" and described "his interactions as appropriate and effective" (*id.* at 645). He told Dr. Hernandez that his anger management skills were good as was his ability "to tolerate stressors" (*id.* at 648). In the

---

[4] There is no record evidence that Plaintiff had experienced any episodes of decompensation.

evaluation of Plaintiff's concentration, persistence, and pace, Dr. Hernandez determined that his attention and comprehension skills were "inadequate" (*id.* at 646).  However, because Plaintiff scored lower than patients with traumatic brain injury on a test that measured his level of attention, comprehension, memory, motivation, and effort, Dr. Hernandez opined that Plaintiff exaggerated "his limitations and the test results are not an accurate representation of his abilities, especially with regard to his achievement skills" (*id.*).  Dr. Whitehorn agreed with Dr. Hernandez's functional assessment, finding Plaintiff had mild restrictions of daily living, mild difficulties in maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace (*id.* at 97-98).

Plaintiff claimed to suffer from sadness, suicidal ideation, and "auditory hallucinations of a voice that calls his name" (*id.* at 648).  Dr. Hernandez stated that Plaintiff's presentation contradicted his self-reported emotional state and she rejected his report of auditory hallucinations (*id.*).  According to Dr. Hernandez, "[t]here was no thought derailment or other indications of psychosis in his demeanor" (*id.*).  She continued by noting that "this type of auditory hallucination has been found to be a common symptom among Hispanic individuals who claim to be depressed" (*id.*).  She diagnosed Plaintiff with depressive disorder NOS and a learning disorder NOS and indicated that he did not meet the criteria for a major depressive disorder (*id.*).  Dr. Hernandez concluded that "[t]he extent to which [Plaintiff] may be employable will be dependent on motivation, opportunity, and verified medical limitations" (*id.*).

Dr. Hernandez's and Dr. Whitehorn's assessments find support in Plaintiff's medical records from 2012, 2013, and 2014, as the ALJ noted (*id.* at 25).  To the extent there were conflicts between their opinions and those of other mental health providers, it is the ALJ's function, not this court's, to resolve them.  *See Pires*, 553 F. Supp. 2d at 21.  Plaintiff was

discharged from CPFS in February 2012 because he had not been treated for six months and was "stabilized on medications" (A.R. at 22, 493).  The Northgate record of September 11, 2013 indicates that Plaintiff's psychiatric exam was normal and his mood was euthymic (*id.* at 23, 675).  However, three months later, on December 7, 2013, Plaintiff went to BMC's emergency room "reporting he was depressed and was having thoughts of harming himself" (*id.* at 723).  He described hearing his dead brother's voice telling him to jump out a window (*id.*).  He was diagnosed with post-traumatic stress disorder ("PTSD") and major depressive disorder, recurrent, severe with psychotic features, and received in-patient treatment from BHN (*id.* at 728, 730, 733).  When Plaintiff was discharged on December 11, 2013, he reported that the counseling and medication improved his mood and ability to sleep, and made the auditory hallucinations "more manageable" (*id.* at 733).

About one month later, on January 15, 2014, Plaintiff told Armando Paez, M.D., an infectious disease specialist at Baystate Medical Center, that he had not seen a mental health counselor since his discharge from BHN, he felt improved, and he was not suicidal or homicidal (*id.* at 778).  Dr. Paez's psychiatric examination on that date revealed that Plaintiff's speech and tone were normal, his insight was good, and his mood was euthymic (*id.*).[5]  Dr. Paez recommended treating Plaintiff's hepatitis C with an all oral regimen of sofosbuvir and ribavirin for twenty-four weeks (*id.* at 779).  Treatment with interferon was not advised due to the "high risk of psychiatric decompensation" (*id.*).

On March 11, 2014, Plaintiff presented to CPFS with depression and, again, was diagnosed with major depressive disorder with psychosis (*id.* at 786, 790).  However, his

---

[5] "Euthemia is defined as 'joyfulness; mental peace and tranquility.'"  *Blais-Peck v. Colvin*, Civil Action No. 14-cv-30084-KAR, 2015 WL 4692456, at *2 n.6 (D. Mass. Aug. 6, 2015) (quoting *Stedman's Medical Dictionary* 678 (28th ed. 2006)).

perception, thought content, orientation, insight, and judgment were within normal limits and he

was not experiencing hallucinations or delusions (*id.* at 24 & n.26, 786).

One month later, on April 11, 2014, Plaintiff requested a crisis assessment at BHN's

Liberty Street clinic because of "increased depression, hopelessness, and feelings of

worthlessness" (*id.* at 821).  He denied suicidal ideation, plan, or intent (*id.*).  The mental status

exam showed:

> [N]o evidence of thought disorder or psychosis.  [His] [t]hought process [was] clear and
> organized.  Insight, judgment and impulse control appear[ed] fair.  [He] denie[d] auditory
> or visual hallucinations, and [did] not appear to be responding to internal stimuli.

(*id.* at 824).  He was diagnosed with mood disorder NOS and PTSD (*id.* at 827).  Although

Plaintiff sought in-patient treatment, the clinicians denied his request (*id.* at 821, 826).  Plaintiff

initially left the clinic when he was asked to provide a urine specimen for a drug screen, but he

returned and submitted a sample (*id.* at 822, 830).  Despite Plaintiff's denial of a history of

substance abuse, his urine tested positive for cocaine (*id.* at 830).  Five days later, on April 16,

2014, Dr. Paez noted that Plaintiff's mood was euthymic (*id.* at 834, 853).  Plaintiff reported that

he was receiving mental health treatment and he had no new issues (*id.* at 853).  The sum of the

records that the ALJ weighed, particularly the consistent positive evaluations of Plaintiff's

thought processes, judgment, and insight and descriptions of his euthymic mood, support the

ALJ's determination at step two that Plaintiff's depression was not severe.

Plaintiff's argument, which focuses on his GAF scores that ranged from 40 to 49 in

December 2013 and March and April 2014, falters because GAF scores are not accorded much

weight (Dkt. No. 15 at 6).[6]  Although the ALJ considered Plaintiff's GAF scores (A.R. at 22 n.8,

---

[6]"A GAF score between 41 and 50 reflects '[s]erious symptoms (e.g. suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or

24), "'GAF scores have been deemed unreliable' by the Social Security Administration itself and,

accordingly, it would be an error for an administrative law judge to focus on a doctor's assessed

GAF scores, rather than the doctor's findings and opinions, to credit or discredit medical

evidence." *Martinez v. Colvin*, Civil Action No. 13-30124-KPN, 2014 WL 3735889, at *3 (D.

Mass. July 11, 2014) (quoting *Hall v. Colvin,* 18 F. Supp. 3d 144, 153 (D.R.I. May 8, 2014)).

Moreover, "a  low, unaddressed GAF score, on its own, 'does not give a fact finder significant

insight into whether [the plaintiff] can perform some type of competitive work' and further, 'does

not undermine the validity of the [ALJ's] decision.'" *Blais-Peck v. Colvin*, Civil Action No. 14-

cv-30084-KAR, 2015 WL 4692456, at *6 (D. Mass. Aug. 6, 2015) (quoting *Querido v.

Barnhart,* 344 F. Supp. 2d 236, 246 (D. Mass. 2004)).  *See also Lopez v. Barnhart*, 78 F. App'x

675, 678 (10th Cir. 2003) (unpublished) ("a GAF score of 40 may indicate problems that do not

necessarily relate to the ability to hold a job"); *Varga v. Colvin*, Civil Action No. 2:14-25, 2014

WL 6687562, at *5 (W.D. Pa. Nov. 26, 2014) ("a particular GAF score does not necessarily

correlate to one's ability to work").[7]

     Finally, even if the ALJ erred in finding Plaintiff's depression to be non-severe, "any such

error is harmless because the ALJ sufficiently took the non-severe impairment[] into

consideration when assessing Plaintiff's RFC." *Blais-Peck*, 2015 WL 4692456, at *6.  *See Noel*

---

school functioning (e.g. no friends, unable to keep a job).'" *Blais-Peck*, 2015 WL 4692456, at *6
n.8 (quoting *DSM-IV-TR* at 34).

[7] The ALJ was not permitted to compare Plaintiff's GAF scores that ranged from 40 to 49 with
other GAF scores, including the GAF score of 70 assigned by Dr. Hernandez, and did not do so
(A.R. at 21-29).  *See Hall v. Colvin*, 18 F. Supp. 3d 144, 153 (D.R.I. 2014) ("'GAF ratings
assigned by different clinicians are inconsistent' and 'adjudicators cannot draw reliable inferences
from the difference in GAF ratings assigned by different clinicians or from a single GAF score in
isolation.'") (quoting SSA Administrative Memorandum AM-13066 (July 22, 2013)).

*v. Astrue,* C.A. No. 11–cv–30037–MAP, 2012 WL 2862141, at *6 (D. Mass. July 10, 2012)

(holding that even if ALJ erred at step two, any such error was harmless where ALJ considered

all of plaintiff's impairments, severe and non-severe, when assessing the RFC).  Plaintiff's only

identified mental shortcoming -- his limited ability to concentrate -- was addressed by the RFC's

additional restriction for remembering and carrying out only simple instructions (A.R. at 27).

> Plaintiff has failed to produce any evidence that suggests a limitation greater than that
> acknowledged by the ALJ in his RFC assessment and, for this reason, []he has neither
> shown "the existence of evidence in the record supporting [his] position" nor
> "demonstrate[d] that the evidence relied on by the ALJ is either insufficient [or] incorrect
> . . . ."

*Blais-Peck,* 2015 WL 4692456, at *6 (quoting *Greene v. Astrue,* No. 11–30084, 2012 WL

1248977, at *3 (D. Mass. Apr. 12, 2012) (emphasis omitted)).

> 3.   Because a treating physician did not opine on the nature and severity of
> Plaintiff's mental impairment, the ALJ did not err by failing to give an
> opinion controlling weight.

Without identification of any specific evidence in the record, especially an opinion of a

treating mental health source who had a "longitudinal picture" of Plaintiff, he argues that the ALJ

erred by not affording controlling weight to the opinion of a treating medical source (Dkt. No. 16

at 8).  20 C.F.R. § 404.1527(c)(i).  *See Rodriguez-Machado v. Shinseki*, 700 F.3d 48, 50 (1st Cir.

2012) (explaining how "'[j]udges are not like pigs, hunting for truffles'" in the record) (quoting

*United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)).  The Commissioner

rightly counters that the ALJ did not consider a treating source's opinion because Plaintiff did not

proffer a treating source's opinion to support his claim of disability based on a mental

impairment (Dkt. No. 21 at 14, 17-19).

"Pursuant to the Social Security regulations, "'[c]ontrolling weight" is typically afforded a

treating physician's opinion on the nature and severity of an impairment where it . . . "is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the claimant's case.'" *Peltonovich*, 2014 WL 4716190, at *9 (quoting *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004)).  *See* 20 C.F.R. § 416.927(d)(2).  However, it is axiomatic that the existence of a treating source's medical opinion, which "reflect[s] [a] judgment[] about the nature and severity of [the claimant's] impairments including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite [his] impairment[], and [his] physical or mental restrictions," is a prerequisite to the ALJ's consideration of the treating source's opinion.  20 C.F.R. § 416.927(a)(1).  *Compare Ross v. Astrue,* Civil Action No. 09-11392-DJC, 2011 WL 2110217, at *3, *5, *7-8 (D. Mass. May 26, 2011) (plaintiff's treating psychiatrist opined that plaintiff was disabled and "had limited memory for recent information, decreased concentration ability and limited ability to interact with co-workers and supervisors," and had a "limited ability to stoop, bend and carry up to ten pounds").  The instant record appears to be devoid of such an opinion.  *See Kiklis v. Astrue*, Civil Action No. 10-10699-NMG, 2011 WL 4768491, at *9 (D. Mass. Sept. 28, 2011) ("The claimant is 'responsible for providing the evidence [used] to make a finding about [the RFC].'") (quoting 20 C.F.R. § 404.1545(a)(3)).

Even if Plaintiff's diagnosis of major depressive disorder was considered to be from a "treating source," the ALJ was not required to give it controlling weight because it was inconsistent with Dr. Hernandez's opinion that Plaintiff suffered from depressive disorder NOS and with other evidence in the record (A.R. at 648).  20 C.F.R. § 416.927(a)(2).  "Inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ to resolve."  *Lee v. Astrue,* Civil Action No. 10–10708–DJC, 2011 WL 2748463, at * 11 (D. Mass. July 14, 2011).  Dr. Hernandez's opinion was based on her personal examination of Plaintiff

(A.R. at 25, 644-48).  Moreover, her opinion was consistent with that of BHN's Liberty Street clinic's treatment providers, who diagnosed Plaintiff with a mood disorder NOS in April 2014, and with Plaintiff's other physicians who described his mood as euthymic in 2013 and 2014 (*id.* at  675, 778, 827, 834, 853).

Plaintiff failed to provide an opinion on whether or not he was disabled.  *See Konz v. Astrue*, Civil Action No. 09-11544-NMG, 2010 WL 5827402, at *7 (D. Mass. Nov. 8, 2010) (ALJ considered the absence of opinions from treating or examining physicians among other factors).  *Compare Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (ALJ's credibility finding was supported by the absence of "medical opinions in the record that state or imply that the claimant would have been precluded or prevented from performing the level of exertion identified").  Accordingly, the ALJ's correctly concluded that Plaintiff was not disabled.

V.   CONCLUSION

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 15) is DENIED, and the Acting Commissioner's motion to affirm the decision (Dkt. No. 20) is GRANTED.

It is so ordered.

Dated:  March 15, 2017                                    /s/ Katherine A. Robertson
                                                                    KATHERINE A. ROBERTSON
                                                                    United States Magistrate Judge